UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 14-304 (PJS/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | **RESPONSE BY THE UNITED** |
| Plaintiff, ) | **STATES TO THE DEFENDANT'S** |
| ) | **SENTENCING POSITION** |
| v. ) | |
| ) | |
| AARON QUOC KHIEU, ) | |
| ) | |
| Defendant. ) | |

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorney John Docherty, respectfully submits this Response to the "Defendant's Position as to Sentencing and Sentencing Memorandum," Document No. 58 on the docket of this case. This Response demonstrates that in this case the intended loss for sentencing guidelines purposes is $4,300,000. The defendant's attempt to claim that no loss was intended flatly contradicts an admission he made when he pleaded guilty before this Court. This claim of defendant's as to loss amount also relies on flawed legal reasoning, specifically a misreading of the holdings of the cases cited by the defendant.

**THE INTENDED LOSS IN THIS CASE IS $4.3 MILLION**

Calculation of a sentence under the United States Sentencing Guidelines ("U.S.S.G.") is an important component of calculating a sentence in a federal criminal case. Even though the guidelines are advisory, their accurate calculation remains a critical step in sentencing, both because "[t]he appropriate guidelines range, though now

1

calculated under an advisory system, remains the critical starting point for the imposition of a sentence under § 3553(a)," *United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005), and because an advisory guideline system continues "to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary," *United States v. Booker*, 543 U.S. 220, 264-65 (2005).

The guidelines provision that governs this case is Section 2B1.1. Guidelines calculations under that section are largely driven by the amount of pecuniary loss, either actual loss or intended loss, attributable to the defendant's criminal conduct. The amount of loss is the greater of either actual loss or intended loss. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," while "'Intended loss (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1, Application Note 3(A)(i) and (ii). Loss sometimes cannot be calculated precisely, and therefore "[t]he court need only make a reasonable estimate of the loss," U.S.S.G., § 2B1.1, Application Note 3(C). In the case of trade secret theft, the guidelines are specific as to the methodology of the loss estimate: "In the case of proprietary information (e.g., trade secrets) [the loss estimate] shall take into account the cost of developing that information. . . ." U.S.S.G., § 2B1.1, Application Note 3(C)(ii). The government "shoulders the burden" of proving the amount of loss by

2

a preponderance of the evidence. *United States v. Killen*, 761 F.3d 945, 949 (8th Cir. 2014).

The Report of Presentence Investigation in this case correctly used an intended loss amount of $4.3 million, the research and development costs Boston Scientific incurred in developing the Mustang Plus PTA catheter, to calculate the advisory guidelines sentence. Report of Presentence Investigation at paragraph 20. In the Plea Agreement and Sentencing Stipulations that described defendant Khieu's guilty plea in detail, the parties agreed that the cost to Boston Scientific of developing the Mustang Plus catheter was $4.3 million. While agreeing that $4.3 million was the amount of research and development costs, the defendant disagreed with the government's view that Boston Scientific's research and development costs were also the guidelines intended loss amount. Plea Agreement and Sentencing Stipulations at paragraph 6(b), pages five and six. The defendant now claims that both the actual and the intended loss amount were zero. The government agrees that there is no evidence of actual loss in this case, but that is only because the defendant failed to get his Vietnamese startup company off the ground, so that it could manufacture virtual duplicates of Boston Scientific's Mustang Plus PTA catheter. The amount of intended loss, however, is $4.3 million.[1]

Defendant's specific claim is that the government bears the burden of persuasion on loss amount, which is true, and that the government, because it cannot prove the defendant's intent to use the stolen trade secrets, cannot meet its burden, which is not

---

[1] In part because intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur," U.S.S.G. § 2B1.1, Application Note 3A(ii), the failure of the defendant's business ambitions is immaterial to the calculation of intended loss.

true. The latter half of defendant's claim is demonstrably false because defendant, when he pleaded guilty before this Court, admitted his intent to use the trade secrets he had stolen.

The Plea Agreement and Sentencing Stipulations in this case, at paragraph two, "Factual Basis," on page three, states:

> The defendant sought to establish his own company, Snowflake Medical, which would manufacture a vascular catheter for PTA called "Snowcat." **The defendant's "Snowcat" catheter was a virtual duplicate of Boston Scientific's new catheter. In order to help manufacture "Snowcat,"** on or about October 8, 2012, in the State and District of Minnesota, the defendant transferred to a personal thumb drive from Boston Scientific's engineering document management system over 100 documents, many of which, including the document whose theft is alleged in Count 11 of the Indictment, contained trade secrets and were prominently labeled as the confidential, proprietary, intellectual property of Boston Scientific. The defendant then left Boston Scientific's premises with the thumb drive. (Emphasis added.)

Defendant, having first admitted that he stole his employer's trade secrets "in order to help manufacture 'Snowcat,'" now claims the government cannot prove that he really intended to use the trade secrets he stole. This Court should hold the defendant to the admissions he made in his plea agreement and sentencing stipulations. In addition, as a matter of common sense (and understanding that defendant's claim, strictly construed, is not that he did not intend to use the stolen trade secrets in his own, competing product, but rather that the government cannot meet its burden of proving intent), defendant's claim that the intended loss was zero would reduce to an assertion that he took his employer's trade secrets intending not to use them – which would make the theft pointless, unless the defendant committed this crime for the thrill of it, or to expose a

4

flaw in his employer's security – claims, which, if made, would contradict not only the admissions in the plea agreement, but the totality of the evidence in this case.

There are also flaws in the legal reasoning with which the defendant tries to support his claim that the intended loss amount is zero. Defendant is simply wrong in his claim that "loss" in a theft of trade secrets prosecution is not the value of the trade secrets stolen, but the value of some subset of the stolen trade secrets actually used, or intended to be actually used, to the victim's detriment. Specifically, the defendant is wrong in asserting that the government must prove that defendant Khieu subjectively intended to use a trade secret.

The Tenth Circuit case that defendant relies upon, *United States v. Manatau*, 647 F. 3d 1048 (10th Cir. 2011) is easily distinguished. Defendant Manatau had stolen, in several different thefts, a number of credit card checks, tied to different credit card accounts. *Manatau*, 647 F.3d at 1048-49. Sometimes Manatau knew the credit limit on the credit card account to which the stolen check was tied, and therefore knew the maximum amount for which he could safely write out a stolen check, but other times he did not. 647 F. 3d at 1049. With regard to one particular account, Manatau stole two checks, and then, not knowing that the credit limit on the account was over $10,000, limited himself to making the two checks out for a total of $1,800. *Id*. Manatau had no checks for that account beyond those two, and so could inflict no further loss on the victim. *Id*. On these facts, the government's contention that the amount of loss should be set equal to the aggregate credit limit on the credit card accounts was accepted by the

district court, but that loss calculation was overturned on appeal to the Tenth Circuit. 647 F. 3d at 1050.

The Eighth Circuit declined to extend the reasoning of the Tenth Circuit's *Manatau* opinion in *United States v. Killen*, 761 F. 3d 945 (8th Cir. 2014) a case involving monthly receipt of stolen Social Security disability benefits, and a case not cited by Mr. Khieu. The district court in *Killen* calculated the intended loss as equal to all the payments defendant Killen had received, plus all the payments she would have received, had she not been caught, until her retirement. *Killen*, 761 F. 3d at 949. (Although not stated in the facts of the Eighth Circuit's opinion, presumably retirement was used as an endpoint for intended loss calculations because that is when Social Security disability benefits would cease and regular Social Security benefits would commence).

The defendant in *Killen* attempted to claim, analogously to the claim advanced by Mr. Khieu in the case at bar, that based on the reasoning of *Manatau*, in order to meet its burden of proving the amount of intended loss, the government needed to establish defendant Killen's subjective intent to continue to receive benefits. *Id*. at 950. The district court disagreed and the Eighth Circuit affirmed, holding that inquiry into a defendant's subjective intent is unnecessary when intended loss and what the Eighth Circuit called "expected loss" are the same. As the Eighth Circuit put it, "[e]ven *Manatau* notes that 'intended loss' can be shown by looking to what loss was 'expected' because . . . a person is presumed to have 'intended the natural, probable consequences of his or her actions.'" The Eighth Circuit then held that "Killen received a continuous, routine amount each month - $674. The district court needed no additional evidence.

6

She intended to keep every dollar of the monthly payment. Thus, unlike in *Manatau*, the district court properly inferred from Killen's conduct that she intended continued receipt of these benefits until retirement without additional *mens rea* evidence." [2]

The case at bar is similar to *Killen*, but even stronger, because of the defendant's admissions in the plea agreement and sentencing stipulations. Defendant Khieu stole trade secrets sufficient to manufacture, in the words of the plea agreement and sentencing stipulation, a "virtual duplicate" of his employer's product. He has admitted he committed his crime in order to help manufacture his own product, i.e., he has admitted he intended to use what he stole. On these facts, this Court should set the amount of intended loss equal to the value of the stolen trade secrets, which is $4.3 million.

---

[2] The inference from behavior in *Killen* was strong enough to overcome the fact that the government, presumably in an attempt to honor its word to a defendant and stand by a plea agreement even when the agreement's loss calculations turned out to be erroneous, joined the defense in objecting to the use of intended loss for guidelines purposes. *Killen*, 761 F.3d at 947. In the case at bar, of course, there is no such handicap, because (a) the government **is** urging the Court to conclude that the defendant intended to use what he stole and (b) this Court has an easier time drawing such a conclusion because, unlike the *Killen* Court, this Court need not circumstantially infer the defendant's intent from the defendant's behavior. This Court simply needs to look to the admission the defendant made before this Court when he entered his plea of guilty.

## **CONCLUSION**

For all of the foregoing reasons, the loss amount for purposes of the advisory sentencing guidelines should be set at $4.3 million.


Dated: December 22, 2015                    Respectfully Submitted,

                                            ANDREW M. LUGER
                                            United States Attorney

                                            s/ John Docherty

                                            BY:   JOHN DOCHERTY
                                            Assistant United States Attorney
                                            Attorney Registration No. 017516X